**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARY ANN REYES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 7359** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mary Ann Reyes applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. § 416. The Social Security Administration denied her application, and an Administrative Law Judge affirmed the Agency's decision. In this lawsuit, Plaintiff seeks judicial review of that decision, which stands as the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant"). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment.

Having carefully reviewed the record, the Court grants Plaintiff's motion for remand and denies Defendant's motion to affirm. Plaintiff has argued that the ALJ should have accorded controlling weight to the opinion of her treating rheumatologist, Dr. Monica Aloman, and that he erred in greatly weighting the consulting medical opinion of Dr. Vidya Madala when making his residual functional capacity ("RFC") determination. Defendant disputes these claims of error and moves for affirmation on

the basis that the ALJ's conclusions were legally valid and had support of substantial evidence.

Although Plaintiff's arguments are unpersuasive for the reasons stated below, the ALJ did not resolve an apparent and significant error in Dr. Madala's opinion prior to assigning it great weight. Dr. Madala evaluated the medical evidence in light of a diagnosis that no doctor had previously assigned to Plaintiff, osteoarthritis, while simultaneously failing to discuss or examine the diagnosis that Plaintiff's physicians repeatedly found, seronegative rheumatoid arthritis.[1] Because the ALJ did not explore this issue, the Court cannot conclude that his decision is supported by substantial evidence.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on February 4, 2012, alleging in her application that she became disabled on September 1, 2007 due to inflammatory rheumatoid arthritis. (R. 175.) The Social Security Administration denied the application initially on May 17, 2012, and again upon reconsideration on September 28, 2012. (R. 12, 87-92, 93-99.) Plaintiff filed a timely request for a hearing and appeared before Administrative Law Judge Jose Anglada (the "ALJ") on June 6, 2013. (R. 31-83.) The ALJ heard testimony from Plaintiff, who was represented by counsel, and vocational expert Linda M. Gels

---

[1]     As explained below, osteoarthritis and rheumatoid arthritis ("RA") both cause joint pain, but they are distinct conditions with different causes and symptoms. RA may be seronegative, which means that a blood test will be negative for antibodies or other immunologic markers of the condition. *See Seronegative*, Dorland's Medical Dictionary, http://www.dorlands.com (last visited Oct. 15, 2015); *What Type of RA Do You Have?*, Arthritis Foundation, http://www.arthritis.org/about-arthritis/types/rheumatoid-arthritis/articles/what-type-do-you-have.php (last visited Oct. 15, 2015).

(the "VE").  Shortly thereafter, on June 26, 2013, the ALJ found that Plaintiff was not disabled at any time from the alleged onset date through the date of decision.  (R. 9-30.)

## FACTUAL BACKGROUND

Plaintiff was born on August 9, 1964, and was 49 years of age at the time of the ALJ's decision.  (R. 172.)  She lives with her husband and three children, the youngest of whom is in grade school.  (R. 34-35.)  Plaintiff graduated from high school and attended one semester of college.  (R. 36.)  Prior to her application for benefits, she worked as a bank teller and in related supervisory positions.  (R. 37-40.)  She left the workforce in July 2007 to care for her youngest child, and fell ill with fatigue and constant pain soon after. (R. 40-41, 54-55, 175.)  Plaintiff made several attempts to reenter the workforce following her 2007 departure, including brief stints in data entry in August 2010 and intermittent, part-time service as a teacher's aide from August 2009 to June 2011.  (R. 40-41, 200.)  Each attempt at sustained employment was unsuccessful due to joint and body pain.  (R. 55-60.)

## A.    Medical History

### 1.    March 2007 through May 8, 2010

On March 5, 2007, Plaintiff was evaluated for a connective tissue disorder by Manjari G. Malkani, M.D., a rheumatologist, upon the referral of her primary care physician.  (R. 261.)  Dr. Malkani's initial evaluation identified no significant signs or suggestions of connective tissue disease, but she opined that Plaintiff's diffuse tender points were consistent with fibromyalgia.[2]  (*Id.*)  She prescribed Elavil (an anti-

---

[2]    Fibromyalgia is a disorder characterized by widespread musculoskeletal pain, fatigue, sleep, and memory and mood issues.  *See Fibromyalgia*, The Mayo Clinic,

depressant) and Flexeril (for pain and stiffness from muscle spasms) and requested additional blood tests. (*Id.*) At a March 21, 2007 follow-up visit, Dr. Malkani noted that lab results were normal and concluded on that basis that there was "little evidence" of connective tissue disease. (R. 262.) Because Plaintiff reported that she tolerated Elavil and Flexeril well, Dr. Malkani continued both prescriptions. (R. 261-62.) She recommended that Plaintiff undergo physical therapy due to complaints of groin pain, which she found to be consistent with tendonitis, and also that Plaintiff return in two months for further examination, at which time she planned to review x-rays of Plaintiff's pelvis and modify the course of treatment in response to the physical therapy's efficacy. (R. 262.)

Plaintiff's medical records indicate that she did not return to Dr. Malkani. At her next medical appointment, nearly two years later on February 16, 2009, she visited another rheumatologist, Harpinder Ajmani, M.D. She complained of diffuse body and joint pain. (R. 258.) Dr. Ajmani's impression was that she suffered from fibromyalgia and polyarthritis (a type of arthritis that affects multiple joints simultaneously). He prescribed Lyrica (a pain medication that treats fibromyalgia) and told her to follow-up in two weeks. (*Id.*) He also ordered blood tests, including anti-CCP antibody and HLA-B27 antigen tests, each of which assists in diagnosing autoimmune conditions such as rheumatoid arthritis.[3] (*Id.*) On February 27, 2009, Plaintiff told Dr. Ajmani that the

---

www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243 (last visited Oct. 15, 2015).

[3] The anti-CCP antibody test looks for antibodies that target CCP. The antibody it is present in a majority of persons with rheumatoid arthritis. *What to Know about RA Test Results*, WebMD, www.webmd.com/rheumatoid-arthritis/arthritis-test-results (last visited Oct. 15, 2015). The HLA-B27 gene is more commonly found in persons who have a type of inflammatory

Lyrica made her body aches "a little better" but did not alleviate her joint pain. (R. 259.) Dr. Ajmani instructed Plaintiff to continue taking Lyrica, start taking Tylenol, and follow-up with him in eight weeks. (*Id.*) His diagnoses remained fibromyalgia and polyarthritis, although he also noted that Plaintiff's labs were negative for serologic evidence of inflammatory arthritis. (*Id.*)

Plaintiff returned to Dr. Ajmani six weeks later, on April 6, 2009, complaining that while she was doing better overall, her fatigue, body aches, and joint pain had not subsided. (R. 257.) Dr. Ajmani observed that although her joints were tender, they showed no signs of synovitis (inflammation of joint lining) and her ongoing symptoms suggested only the presence of fibromyalgia and not polyarthritis. (*Id.*) He added to her medication regimen piroxicam (a non-steroidal anti-inflammatory drug, or "NSAID," that commonly treats arthritic pain) and asked her to follow-up in two months. (*Id.*)

Before two months passed, on May 16, 2009, Plaintiff returned to Dr. Ajmani. She complained of pain in her hands, shoulders, and knees, fatigue, and said that she was unable to tolerate the piroxicam. (R. 256.) His reinstated his prior diagnosis of both polyarthritis and fibromyalgia. (*Id.*) He also ordered medical imaging, and although a May 19, 2009 body scan showed scoliosis of the thoracolumbar spine, it was otherwise normal. (R. 245.) Plaintiff saw Dr. Ajmani again one week later, on May 23, 2009. (R. 255.) As with her prior visits, she complained of ongoing fatigue and pain. He maintained the Lyrica prescription and newly prescribed Plaquenil (which treats rheumatoid arthritis) and instructed her to return six weeks later. (*Id.*) He wrote in his

arthritis called ankylosing spondylitis. *See HLA-B27 and Ankylosing Spondylitis*, HLA-B27 Blog, www.hlab27.org (last visited Oct. 15, 2015).

treatment notes that Plaintiff had "probable" inflammatory arthritis along with fibromyalgia. (*Id.*)

Plaintiff next saw Dr. Ajmani six months later, on November 7, 2009. His diagnoses of her conditions were "seronegative" polyarthritis and fibromyalgia, the latter of which he believed to cause "most [of her] pains." (R. 254.) Because she reported that the Plaquenil had been helpful, Dr. Ajmani refilled the prescriptions for that medication and also the Lyrica, and he told her to begin taking Lodine (another NSAID often used to treat arthritic pain). (*Id.*) Additionally, he opined that she was in poor compliance with his treatment plan because she had not followed-up within the recommended six weeks. (*Id.*) Dr. Ajmani again asked Plaintiff to return in six weeks, at which point he would assess her response to the medications. (*Id.*)

Upon her follow-up on December 19, 2009, Plaintiff reported that, overall, her condition was "no better." (R. 253.) Dr. Ajmani opined that fibromyalgia was causing most of her pain, and that the "polyarthritis" was mild.[4] (*Id.*) He also observed, as with prior visits, that her joints lacked signs of synovitis but were tender. (*Id.*) He discontinued Plaquenil and Lodine because Plaintiff stated they were not helpful and instructed her to take Voltaren gel (a topical NSAID that treats arthritic pain) and Osteo-Bi-Flex (a joint health supplement). (*Id.*)

On January 15, 2010, at the recommendation of her primary care physician, Plaintiff attended a physical therapy evaluation with Candy Nishimura, P.T., a physical therapist at Sportho Physical and Aquatic Therapy. (R. 392, 410.) Plaintiff reported to

---

[4]     Although his nomenclature changed, Dr. Ajmani's treatment notes evince no modification to his impression of Plaintiff's condition on this date. Thus, his reference to "polyarthritis" appears to be shorthand for seronegative polyarthritis.

Nishimura that she had difficulty standing and walking for lengthy periods of time, and suffered from aches in her joints, primarily in the hips. (R. 392.) Nishimura noted some decreases in flexibility and strength in Plaintiff's lower extremities, and she recommended a home exercise regimen and aquatic therapy. (R. 393.) Throughout January and February, Plaintiff reported improvement in her condition as a result of the therapy regimen. (R. 386-89.) By late March and April, however, she stated that the pain and fatigue had reappeared and she discontinued therapy soon after. (R. 385-86.)

During several visits with Dr. Ajmani in 2010, Plaintiff reported no improvement in her body and joint pain. On February 6, 2010, Dr. Ajmani discontinued Lyrica and Osteo-Bi-Flex and initiated a prescription for Robaxin (a muscle relaxant) and Ambien (a sleep aid) due to Plaintiff's ongoing complaints, which consisted of joint and body pain, fatigue, poor sleep, and other medication side effects such as weight gain. (R. 252.) His notes reflected continuing diagnoses for fibromyalgia and "polyarthritis," and he also noted "active synovitis" along with tenderness in Plaintiff's joints. (*Id.*) Yet at a February 27, 2010 visit, the only diagnosis he listed in his notes was fibromyalgia, and he stated that her joints were "ok," even though they were tender. (R. 251.) Likewise, on May 8, 2010, his sole diagnosis was fibromyalgia, as Plaintiff's joints were tender but "ok." (R. 250.)

### 2.     May 20, 2010 through August 2011

On May 20, 2010, Plaintiff sought a second opinion for "fibromyalgia" with Monica Aloman, M.D., a rheumatologist at Advocate Medical Group. (R. 324.) Plaintiff reported fatigue, joint pain and swelling, and also back pain. (R. 325.) Dr. Aloman observed swelling and tenderness in Plaintiff's shoulders, but other musculoskeletal regions were

free of tenderness, and all areas had normal ranges of motion.  (R. 326-27.)  She wrote

that Plaintiff's hip, shoulder, and wrist pain were stable on that particular day.  (R. 327.)

In her assessment, Dr. Aloman noted that Plaintiff's prior labs were negative for HLA,

the anti-CCP antibody, and rheumatoid factor ("RF"), but that an antinuclear antibody

("ANA") test had been positive.[5]  She did not make a particular diagnosis, but instead

ordered Tylenol as needed for pain, x-rays of Plaintiff's hips, shoulders, knees, pelvis,

and joints, and additional labs to test for inflammatory arthritis.  (*Id.*)  The x-rays were

normal, evidencing only minimal degenerative changes in Plaintiff's cervical spine.  (R.

334-42.)  In a May 26, 2010 lab report, Plaintiff's ANA test was abnormal, but her anti-

CCP antibody test was still negative.  (R. 380.)

Plaintiff returned to Dr. Aloman on June 3, 2010.  She complained of generalized

body aches and also pain in her shoulders, wrists, and hips, and she described the pain

level as eight out of ten at its apex.  She also stated that Tylenol was ineffective at

managing the pain.  (R. 319.)  In her treatment notes, Dr. Aloman noted that the results

of the lab work had been negative for inflammatory arthritis.  (R. 319.)  She also

described the condition of Plaintiff's musculoskeletal system as unchanged from the

May visit.  (R. 321.)  Nevertheless, Dr. Aloman assessed that Plaintiff may have

sacroilitis and also inflammatory arthritis, and she prescribed sulfasalazine (to reduce

---

[5]      The ANA test is "a blood test that looks at antinuclear antibodies (ANA).  Antinuclear antibodies are substances produced by the immune system that attack the body's own tissues." *Antinuclear     Antibody     Panel*,     U.S.     Nat'l     Library     of     Med., https://www.nlm.nih.gov/medlineplus/ency/article/003535.htm (last visited Oct. 15, 2015). Although a positive ANA test is not determinative of rheumatoid arthritis, "[m]any people with RA have     positive     ANA     tests." *Diagnosing     Rheumatoid     Arthritis*,     Healthline, http://www.healthline.com/health/rheumatoid-arthritis-diagnosis#BloodTests2 (last visited on Oct. 15, 2015). Similarly, RF is present in 70 to 80 percent of patients with RA, as is the anti-CCP antibody in 60 to 70 percent of persons.  *Id.*

inflammation), prednisone (a corticosteroid that also treats inflammation) and Enbrel (a biologic that treats severe rheumatoid arthritis and other inflammatory conditions) (R. 322.) In addition, she ordered an MRI, which found mild left sacroilitis that likely resulted from degenerative changes to Plaintiff's spine. (R. 331).

Plaintiff's pain continued throughout summer and fall 2010. On July 1, 2010, Dr. Aloman once again saw Plaintiff for what her treatment notes described as "rheumatoid arthritis." (R. 315.) Plaintiff reported no relief from her hand, shoulder, knee, and wrist pain. (R. 315.) Dr. Aloman's assessment was that Plaintiff suffered from "inflammatory arthritis," sacroilitis, and persistent pelvic pain, the latter of which she suspected had a cause other than arthritis. (R. 318.) She increased the prednisone dosage, ordered a CT of Plaintiff's abdomen and pelvis, and instructed Plaintiff to return to the clinic in six weeks. (*Id.*) The CT was essentially unremarkable and provided no information about the source of Plaintiff's pelvic pain. (R. 332.)

On September 9, 2010, when Plaintiff next returned to the clinic, Dr. Aloman again wrote that Plaintiff's chief complaint was "rheumatoid arthritis." (R. 310.) Plaintiff reported that her pelvic pain had not subsided, and she also complained of fatigue, morning stiffness, and pain in her back, muscles, and joints. (R. 310-11.) Although Plaintiff indicated that Enbrel was ineffective, Dr. Aloman renewed the prescription and also increased the sulfasalazine dosage. (R. 310, 313.) Dr. Aloman assessed that Plaintiff had "seronegative arthritis," and that her pelvic pain was secondary to Plaintiff's "rheumatological condition." (*See* R. 313.) During the next appointment, on November 18, 2010, Plaintiff returned due to "rheumatoid arthritis" and stated that the Enbrel had improved the pain and Ultram had not. (R. 306.) Dr. Aloman told Plaintiff to stop taking

Ultram but to continue taking Enbrel, ordered lab work (the results of which were unremarkable), and opined that Plaintiff's ailments were "seroneg[ative] arthritis" and sacroilitis. (R. 309, 365-75.)

For nearly all of 2011, Plaintiff's condition was mostly unchanged, and Dr. Aloman continued to manage Plaintiff's pain. On April 1, 2011, Plaintiff visited Dr. Aloman for "rheumatoid arthritis." She rated the fatigue as very low, but stated that her pain levels were high in the hands, knees, feet, and shoulders. (R. 300, 302.) Dr. Aloman's diagnosis of "seroneg[ative] inflammatory arthritis" was consistent with prior examinations, and she assessed Plaintiff's high pain levels as an acute flare-up. (R. 304.) She newly prescribed methotrexate (often used to treat RA) and Norco (an opioid pain reliever) to accompany Enbrel. (*Id.*) Six weeks later, on May 18, 2011, Plaintiff complained to Dr. Aloman of pain on the right side of her body. She rated the pain as seven and her fatigue as six. (R. 295.) Dr. Aloman added ibuprofen to Plaintiff's course of treatment, and also ordered an electromyography ("EMG"), a bone scan, and an ANA panel. (R. 299.) Although the bone scan was unremarkable, the ANA test dated June 2011 test was abnormal. (R. 328, 362, 364.)

At Plaintiff's August 31, 2011 appointment with Dr. Aloman, she described severe bouts of pain during the prior month and pain in all of her joints and hips. (R. 292.) Dr. Aloman's diagnosis was "seroneg[ative] inflamm[atory] arthritis." (R. 294.) Dr. Aloman again ordered a bone scan, lab work, and an EMG. (R. 294.) The September 3 bone scan and August 31 lab results were unremarkable. (*See* R. 330, 358-61.) When Plaintiff next saw Dr. Aloman on September 28, 2011, Plaintiff communicated that her condition had improved: she characterized her pain as one out of ten and described "no

problem[s]" with fatigue. (R. 499.) Dr. Aloman concluded that the methotrexate and Enbrel were effectively controlling Plaintiff's "seronegative arthritis," and she renewed the prescriptions due to their apparent efficacy. (R. 503.) She directed Plaintiff to return in six months.

### 3. February 2012 through May 2013

Approximately four months later, on February 4, 2012, Plaintiff filed her DIB claim on the basis that inflammatory rheumatoid arthritis had rendered her unable to work. (R. 172-80.) On February 22, 2012, Plaintiff saw Dr. Aloman again. Rating her pain as five and her fatigue as six, she complained of pain "all over her body" and stated that it was relieved by "nothing." (R. 494, 497.) Dr. Aloman observed no swelling or tenderness in her joints, and assessed that Plaintiff had stable "seronegative arthritis," chronic pain, insomnia, a vitamin D deficiency, and possible fibromyalgia. (R. 495-96.) Dr. Aloman decreased Plaintiff's methotrexate dosage and resumed the prescription for Elavil and Ambien. She also ordered additional lab work and told Plaintiff to return in six weeks. (R. 496.)

On March 19, 2012, Dr. Aloman completed an Arthritic Report at the request of the Disability Determination Services Office of the State of Illinois (the "state agency"). Dr. Aloman specified that Plaintiff's diagnosis was "seronegative inflammatory arthritis." (R. 240.) Noting that the most recent exam occurred on February 22, 2012, Dr. Aloman remarked that Plaintiff presented with pain, tenderness, stiffness, swelling, and fatigue; her grip strength "measured by psi" was 3 out of 5 in each hand; pain caused Plaintiff difficulties with thumb opposition; Plaintiff's arthritis significantly limited her ability to engage in repetitive reaching, handling, and fingering tasks, and also grasping, turning,

and twisting objects with her right extremities; Plaintiff had difficulties with holding utensils, combing her hair, and turning a door knob; and that her condition limited her fine finger manipulation abilities in both hands.  (R. 240-41.)  Additionally, Dr. Aloman opined that Plaintiff could not use her upper extremities for normal lifting or carrying of ten-pound objects, that she required periods of walking during the workday, that she could sit or stand only for fifteen-minute periods, and that she needed employment that permitted shifting from sitting, standing, and walking due to her back pain and knee pain.  (R. 241-42.)

On April 25, 2012, Plaintiff participated in a consultative examination with Mahesh Shah, M.D., a physician for the state agency.  (R. 268.)  Dr. Shah remarked that Plaintiff appeared fatigued, and walked and moved without assistance or difficulty, albeit slowly.  (R. 269.)  His review of systems was generally unremarkable, other than finding tenderness in Plaintiff's left shoulder and knee.  (R. 270.)  He found that her handgrip and finger grasps were normal, as were her fine and gross manipulation abilities.  (*Id.*)  Dr. Shah noted that blood work in Plaintiff's medical records was negative for rheumatoid arthritis, and, therefore, he was "not sure what kind of inflammatory disease the claimant has."  (R. 271.)  Although he speculated that her symptoms might suggest chronic fatigue syndrome or fibromyalgia, he opined that Plaintiff needed "further work-up by a rheumatologist."  (*Id.*)

On May 14, 2012, Vidya Madala, M.D., also a physician for the state agency, prepared a consultative medical opinion without examining Plaintiff.  Her report indicated that she considered medical records from Dr. Ajmani and Dr. Aloman, Dr. Shah's exam opinion, and Plaintiff's work history and daily activities.  (R. 88-89.)  Her

"findings of fact and analysis" consisted of: (1) an extensive quotation of Dr. Shah's impression; (2) a statement that "[the claimant's] limitations are not credible per the evidence. Controlling weight given to Dr. Shah"; (3) her observation that Plaintiff's doctors had not provided medical source statements; and finally, (4) a short discussion of a few discrepancies between Dr. Aloman's limitation opinions in the Arthritic Report and that Doctor's February 22, 2012 exam notes. (R. 89.) Dr. Madala noted in the same factual findings that Dr. Aloman diagnosed Plaintiff with "seronegative inflammatory arthritis." (*Id.*) Subsequently, Dr. Madala inexplicably identified Plaintiff's "impairment diagnosis" as "osteoarthritis and allied disorders." (R. 89-90.) The opinion contained no explanation for this discrepancy.

Plaintiff did not see Dr. Aloman again until June 12, 2012, at which time she complained of worsened pain "all over" her body, which she rated as ten out of ten. (R. 492.) She stated that she had not started taking Elavil as Dr. Aloman had prescribed; Dr. Aloman reiterated her instructions that Plaintiff should take Enbrel and Elavil, and she also increased the dosage of methotrexate. (R. 492-93.) In addition, Dr. Aloman ordered a bone scan, which occurred on July 14, 2012 and was unremarkable. (R. 328.)

On July 9, 2012, Plaintiff had a physical examination (at the referral of her primary care physician) with Mohammed Y. Qasim, M.D., a pain management specialist at Advocate Christ Medical Center. (R. 564). Plaintiff complained of pain in her wrists, ankles, and elbows lasting more than five years, and stated that the pain worsened since 2009. (*Id.*) Dr. Qasim observed that Plaintiff's diagnoses were fibromyalgia and rheumatoid arthritis, and he noted that her pain characterizations were typically low with

prominent spikes in severity during "random" pain episodes that lacked identifiable triggers. When those episodes occurred, Dr. Qasim wrote that Plaintiff was unable to obtain relief through any measure. (*Id.*)

In his physical examination, Dr. Qasim found that Plaintiff's gait showed no signs of abnormality; that her spinal range of motion was unlimited; that palpitation of her neck, shoulders, back, and lower extremities for tenderness was negative; and that tender trigger points were present along the paraspinal muscles from the neck to the spine. (R. 565-66.) Palpitations in the lower extremities and hips were negative, and other tests were normal. (R. 566.) He rated her strength as four of five in all muscle groups in the upper and lower extremities. (*Id.*)

Dr. Qasim observed that Plaintiff had nociceptive pain—sharp, aching, or throbbing pain that results from damaged body tissues—that was "secondary to musculoskeletal comorbidities," and also an adjustment disorder to chronic pain. (*Id.*) He established treatment goals of pain alleviation and modifications to daily activities to relieve acute exacerbation of pain. (*Id.*) Dr. Qasim also emphasized to Plaintiff that she should limit her use of opioid medications to only those instances when pain is severe and she should consult with a pain psychologist for assistance with "coursing in relaxation" when pain was acute. (*Id.*)

On September 27, 2012, C.A. Gotway, M.D., provided a second consulting opinion to the state agency without examining Plaintiff. (R. 93-99.) Relying on the same evidence as Dr. Madala, Dr. Gotway opined that the "PE findings"—presumably, Dr. Shah's physical exam—were consistent with the "initial level determination" of the agency (namely, that Plaintiff is not disabled). (R. 95-96.) Like Dr. Madala, Dr. Gotway

did not identify his basis for deeming osteoarthritis to be Plaintiff's "impairment diagnosis." (R. 96.)

During her next examination with Dr. Aloman, on October 17, 2012, Plaintiff complained of pain in her wrists, knees, and feet, and also on the left side of her upper body. (R. 488-89.) She rated the pain as three out of ten. (R. 489.) Dr. Aloman again stated that Plaintiff's diagnosis was "seroneg[ative] arthritis." (R. 490.) In the physical examination, Dr. Aloman discovered a nodule on Plaintiff's left wrist and referred her to a specialist. (R. 489.) Modifying the medication regimen, Dr. Aloman prescribed Ambien and Ultram as needed, renewed the methotrexate prescription, and newly prescribed Remicade (an intravenously administered biologic for rheumatoid arthritis). (R. 490.) In addition, Dr. Aloman ordered an ANA panel, the results of which were within normal limits. (R. 431, 433.)

Days later, on October 26, 2012, Plaintiff visited MidAmerica Hand to Shoulder Clinic for evaluation of the left wrist mass. (R. 425.) A hand and upper extremity specialist recommended aspiration, and on November 6, 2012, Plaintiff underwent the procedure. (R. 424-25.) The surgeon diagnosed Plaintiff with De Quervain's tendinitis.[6] (R. 424.) Plaintiff returned for postoperative visits on November 17, 2012 and December 14, 2012, and reported that she experienced no lingering pain from the surgery. (*Id.*) The specialist observed a well-healed incision, no tenderness, and stated that Plaintiff required no further follow-up visits. (*Id.*)

---

[6]     De Quervain's tendinitis is painful inflammation of tendons in the thumbs to the wrist. Rheumatoid arthritis is a suspected cause. *What is De Quervain's Disease?*, WebMD, www.webmd.com/rheumatoid-arthritis/de-quervains-disease (last visited October 15, 2015).

Plaintiff next saw Dr. Aloman on February 20, 2013 for what Dr. Aloman described as "seroneg[ative] RA." (R. 485.) Plaintiff told Dr. Aloman that she has "good days and bad days" and on that particular day, she was experiencing no pain. (R. 485-86.) Dr. Aloman reviewed Plaintiff's bodily systems and noted no abnormalities. (R. 485.) Plaintiff indicated that the Remicade helped relieve her pain, so Dr. Aloman increased the dosage, refilled the Voltaren gel, prescribed Ultram as needed, and instructed Plaintiff to follow-up in six months. (R. 487.)

On May 6, 2013, Plaintiff presented at Advocate Medical Group's Adult Medicine Center due to pain all over her body and in her left foot, which she described as a burning sensation. (R. 548.) Mihaela Mihailescu, M.D., a rheumatologist, diagnosed Plaintiff with fibromyalgia, seronegative rheumatoid arthritis, paresthesia (tingling), and "taking high-risk medication." (*Id.*) Dr. Mihailescu ordered several diagnostic procedures, including x-rays, a RF test, and an EMG. (*Id.*) A May 15, 2013 EMG report found "[o]nly extremely minimal, and actually somewhat questionable, abnormalities . . . on the electrodiagnostic examination," with an absence of mononeuropathy to explain Plaintiff's left ankle pain and other symptoms. (R. 550-51.) However, unlike earlier tests, the rheumatoid factor test on June 10, 2013 found an abnormally high level of the antibody.[7] (R. 554.)

---

[7] As noted in footnote 5, rheumatoid factor is often present in RA patients, and those who initially test negative may later test positive for the antibody. *See* T. Tuomi et al., *Seronegative Arthritis in an Eight-Year Longitudinal Study*, 17 Scandinavian J. Rheumatology 67, 67 (1988) ("Then there are those patients who are initially seronegative but eventually become seropositive and those who change from seropositive to seronegative during the course of their disease.").

**B.    The ALJ's Decision**

The ALJ determined that Plaintiff suffers from osteoarthritis and fibromyalgia, each a severe impairment under the applicable regulations.  (R. 14.)  He observed that Plaintiff also has mild obesity, but because the condition has only a minimal effect on Plaintiff's functional limitations, it was not a severe impairment.  (R. 14-15.)  Similarly, he considered Plaintiff's assertion that she is depressed, but the record's absence of documentation or treatment for depression led him to conclude that this, too, is a non-severe impairment.  (R. 15.)

The ALJ next evaluated whether Plaintiff's fibromyalgia or osteoarthritis met or medically equaled the severity of the impairments listed in the appendices to Subpart P of 20 C.F.R. Part 404.  (*Id.*)  Specifically, he considered Listings 1.02, 1.04, and 14.00, and he found in each instance that the medical records established that Plaintiff's impairments did not satisfy the relevant criteria.  (R. 15-16.)  In particular, with respect to Listing 14.00, he stated:

> I have also considered whether the claimant's impairments meet any Listing found in Listing 14.00 (immune system impairments).  However, the claimant does not meet the criteria of the listings in 14.00, specifically listings 14.06 (undifferentiated and mixed connective tissue disease) and 14.09 (inflammatory arthritis), as the record fails to document blood tests positive for rheumatoid arthritis or persistent inflammation resulting in the inability to ambulate or perform fine/gross movements effectively.

(R. 15-16.)

Thereafter, the ALJ found that Plaintiff's RFC permitted light work with the following additional restrictions: she can lift and carry only twenty pounds occasionally and ten pounds frequently; she can be on her feet standing or walking for six hours in an eight hour work day, with normal rest periods, and can sit for six hours in a normal

work day; she may not work at heights, climb ladders, or frequently negotiate stairs; she may only occasionally crouch, kneel, or crawl; she should avoid operation of moving or dangerous machinery; and she may frequently (but not constantly) handle and manipulate bilaterally. (R. 16.)

In so concluding, the ALJ reviewed Plaintiff's subjective complaints and allegations, her daily activities, her medical records, and medical opinions and treatment notes by Dr. Aloman, Dr. Shah, Dr. Madala, and Dr. Gotway. (R. 24-25, 89.) In assessing the opinion evidence, the ALJ accorded "minimal weight" to Dr. Aloman's Arthritic Report because the extent of limitations documented therein was inconsistent with the "most recent" progress note dated February 22, 2012. (R. 24-25.) Additionally, the ALJ discounted Dr. Aloman's opinion because it conflicted with Dr. Shah's March 19, 2012 consultative exam findings and Dr. Madala's consultative opinion. (R. 24.) In contrast, the ALJ afforded "great weight" to the opinions of Dr. Madala and Dr. Gotway, although he afforded little weight to their lifting and carrying capacity findings due to the objective evidence in the record. (R. 25.)

The ALJ also found Plaintiff's subjective allegations "not entirely credible," pointing to: inconsistency between the evidence of her condition's onset (which he found to be early 2009) and the date she left the workforce, July 20, 2007; her attempts to reenter the workforce following the alleged onset date; her articulated reason for initially leaving the workforce—namely, to take care of her youngest child; the discrepancy between her subjective complaints and objective medical evidence; the conservative nature of her treatment; and inconsistent testimony about her treatment history. (*See* R. 21-23.)

Relying on the testimony of the VE, the ALJ determined at step four that Plaintiff's RFC permitted her return to past relevant work. (R. 25-26.) He observed that she had previously worked as a teller and "cashier," performing each at the light level, and that there was no basis in the record to conclude that Plaintiff would be unable to perform these jobs with her present limitations. (*Id.*) Accordingly, the ALJ found that Plaintiff was not disabled at any time from the alleged onset date through the date of decision, and denied her claim for benefits. (R. 26.)

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The Court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v.*

*Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).  Similarly, where the Commissioner's decision "lacks adequate discussion of the issues," Seventh Circuit precedent requires remand.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing cases).

## B.    Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.  *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[8]  A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009) (quoting 42 U.S.C. § 423(d)(1)(A)).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

---

[8]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*

**C.    Analysis**

In arguing that the ALJ should have given controlling weight to the limitations set forth in Dr. Aloman's Arthritic Report, Plaintiff advances three grounds upon which the ALJ's decision must be reversed.   Embedded within one of these arguments is the related contention that the ALJ gave improper weight to the consulting opinion of Dr. Madala.   Each of these arguments turns on whether the ALJ adhered to the applicable regulations for weighting of medical opinion evidence.

**1.    Legal Standard for Weighting Opinion Evidence**

The Social Security regulations govern an ALJ's weighting of medical opinions. 20 C.F.R. § 404.1527(c).  A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.   20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).   An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2010), and he must determine, even when he does not assign controlling weight to a treating physician's opinion, what weight it merits in light of (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ.   20 C.F.R. § 404.1527(c)(2)-(5); *see also Simila*, 573 F.3d at 515.

Thus, even when a medical opinion is not entitled to controlling weight, the ALJ must consider it along with each medical opinion in the record. 20 C.F.R. § 404.1527(c) ("we will evaluate every medical opinion we receive . . ."); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) ("A decision to deny a physician's opinion controlling weight does not prevent the ALJ from considering it . . . ."). Based upon the above factors, the ALJ must assign weight to each opinion and "minimally articulate" his reasons for so weighting. *Elder*, 429 F.3d at 415. The standard, in the Seventh Circuit's words, is "lax." *Id.*

## 2. Weight of Dr. Aloman's Opinion

Plaintiff's first two assignments of error are that the ALJ erred in rejecting Dr. Aloman's opinion about her gripping ability and in his analysis of Dr. Aloman's February 22, 2012 progress note.

### a. Gripping Abilities

Plaintiff claims error in the ALJ's decision to discount Dr. Aloman's opinion as to her decreased grip strength on the sole basis that Dr. Aloman's progress notes did not document such a limitation. (Doc. 12, at 3-4.) Defendant counters that Dr. Aloman's notes not only contain an absence of documented gripping limitations, but also repeatedly state that Plaintiff's hands were free of tenderness, swelling, and deformities, and that she had a normal range of motion in both hands. (Doc. 14, at 6.) In addition, she points to Dr. Shah's exam finding that Plaintiff's gripping ability was normal. (*Id.*)

The ALJ was correct. "An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician." *Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2004). In *Skarbek*, the court reviewed the

decision of the ALJ to discount the opinion of a claimant's treating physician regarding the claimant's limited ambulation and lifting abilities. The ALJ reasoned that the treating physician's opinions lacked support of medical evidence such as medical imaging or documentation in progress notes, and also that his opinion conflicted with the findings of two consulting doctors. *Id.* at 504. No differently than *Skarbek*, the ALJ in this case observed that Dr. Aloman's progress notes over several years documented no limitation in Plaintiff's gripping abilities and stood in opposition to Dr. Shah's contrary examination finding. These are legally valid reasons for discounting Dr. Aloman's opinion, and the ALJ's determination to afford lower weight on that basis rests on substantial evidence.

### b. February 22, 2012 Exam Note

Next, Plaintiff urges that the ALJ erred in his analysis of Dr. Aloman's February 22, 2012 exam note. Specifically, the ALJ stated that "Dr. Aloman's notes from the most current examination (February 22, 2012), showed that the claimant has no localized joint pain, joint tenderness, or swelling." (R. 24.) Plaintiff points out that February 22, 2012 was not the most recent exam at the time of decision, for Dr. Aloman continued to treat Plaintiff after that exam. Progress notes from those subsequent visits, Plaintiff observes, describe high levels of pain during her "bad days," thereby undercutting the ALJ's conclusion that Plaintiff lacks joint paint. (Doc. 12, at 4.) She also argues that the February 22, 2012 note, although reflecting an absence of localized pain, also states that Plaintiff's pain level was five out of ten and that the pain was "all over." (*Id.*, citing R. 494.) Thus, in her view, Dr. Aloman's progress note does not "contrast sharply," as the ALJ stated, with the March 19, 2012 Arthritic Report. (*Id.*)

Defendant responds that Plaintiff misreads the ALJ's analysis of Dr. Aloman's opinion. Noting that the phrase "most current examination" referred to the most recent progress note at the time Dr. Aloman prepared the Arthritic Report—that is, the February 22 exam—Defendant focuses on the ALJ's statement that "Dr. Aloman's opinion is not supported by clinical and laboratory diagnostic techniques which are generally negative, mild, or intermittent, and the opinion is inconsistent with other substantial evidence of record." (Doc. 14, at 7, quoting R. 24.) In Defendant's view, this statement confirms that the ALJ considered each of Dr. Aloman's progress notes when finding a discrepancy between her opinion and the evidence. (Doc. 14, at 7.) Further, Defendant contends that the ALJ was correct to disregard the statements to which Plaintiff points, *i.e.* the pain rating and its locations, because these portions of the February 22 note were merely transcriptions of Plaintiff's subjective complaints, which the ALJ had already dismissed as not credible.

Defendant correctly reads the phrase "most current examination" as associated with the March 19, 2012 Arthritic Report. The ALJ's lengthy discussion of Plaintiff's medical treatment history (R. 17-21) demonstrates that the ALJ, when assigning weight to Dr. Aloman's opinion, did so in light of the whole of her progress notes, rather than only the February 22 exam. The ALJ held no mistaken belief, as Plaintiff implies, that Dr. Aloman's treatment of Plaintiff ended on February 22 or that the relevant progress note was the entirety of her treatment records. Thus, there was no error.

Similarly, the ALJ correctly distinguished between portions of the February 22 treatment note that were Plaintiff's own statements and Dr. Aloman's medical assessment. In contrast to the physical exam portion, in which Dr. Aloman documented

no swelling or joint tenderness (R. 495), the statements to which Plaintiff points reside in the history portion, in which Dr. Aloman transcribed Plaintiff's spoken complaints. It is true that Dr. Aloman's course of treatment demonstrates that she did not doubt the veracity of Plaintiff's complaints of severe pain—indeed, she supplemented Plaintiff's medication regimen with pain relievers of increasing strength and also invasive biologic measures. Nonetheless, the ALJ was free to question the credibility of Plaintiff's subjective statements and, relying upon his adverse credibility determination (which Plaintiff did not challenge), discount Dr. Aloman's opinion to the extent it relied on those subjective complaints. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) ("If the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it."). In sum, the ALJ did not err in his analysis of the February 22, 2012 exam note when evaluating Dr. Aloman's Arthritic Report.

### 3. Weight of Dr. Madala's Opinion

Lastly, Plaintiff finds error in the ALJ's use of Dr. Madala's opinion to discredit Dr. Aloman's Arthritic Report and thereby deny it controlling weight. She contends that the only evidence in the record inconsistent with the limitations in Dr. Aloman's Arthritic Report is Dr. Madala's opinion. In Plaintiff's view, the ALJ improperly relied upon Dr. Madala as a source of inconsistency because the ALJ rejected Dr. Madala's opinions about Plaintiff's carrying and lifting abilities. In other words, Plaintiff suggests that the ALJ's disagreement with a portion of Dr. Madala's consulting opinion precludes him from accepting any portion thereof. Relatedly, the Court understands Plaintiff to attack

the weight that the ALJ afforded to Dr. Madala's opinion in the RFC determination in its own right, although she does not state the argument with great clarity.

Defendant counters that Plaintiff's position lacks legal support. She points out that, under Seventh Circuit precedent, there is no error "in the ALJ's decision to accord greater weight to the opinions of a state agency physician, where that opinion was well-reasoned and supported [by] the evidence as a whole." (Doc. 14, at 10.) She identifies particular evidence in the record that supported Dr. Madala's opinion and, thereby, supports the ALJ's decision to accord it great weight.

The ALJ's rejection of the carrying and lifting restriction articulated by Dr. Madala did not preclude him from greatly weighting Dr. Madala's opinion. The rule in this circuit is that "an ALJ may choose to adopt only parts of [a medical] opinion . . . ." *Blanchard v. Astrue*, No. 10-cv-338, 2011 WL 839535, at *7 (E.D. Wis. Mar. 7, 2011) (citing *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)). In *Foglio v. Colvin*, for example, the ALJ disagreed with one portion of a physician's opinion but agreed with another, and his RFC finding incorporated both determinations. No. 12 C 5270, 2014 WL 684643, at *9 (N.D. Ill. Feb. 19, 2014). In rejecting the plaintiff's argument that the ALJ had impermissibly "cherry-picked" through the evidence, the court found the conclusion free of error because the evidence supported these findings. *Id.* (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). No differently, although the ALJ in this case identified evidence upon which he discounted Dr. Madala's lifting and carrying limitation findings, he retained the ability to accept Dr. Madala's opinions on other matters.

Moreover, Plaintiff's contention that only Dr. Madala's opinion conflicted with Dr. Aloman's Arthritic Report lacks merit. Defendant identifies the medical evidence that

the ALJ discussed and summarized in his decision, and she correctly argues that the ALJ relied on the totality of this evidence when finding a conflict between the record and Dr. Aloman's opinion. Notably, the evidence to which he pointed included Dr. Aloman's own treatment notes and the absence of documented exertional limitations therein. Those were legally valid reasons for discounting Dr. Aloman's opinion. *Simila*, 573 F.3d at 515 (finding no error in the ALJ's reasoning that a medical opinion "was unsupported by and inconsistent with the evidence"). As the Seventh Circuit explained in *Bauer*, the treating physician rule applies only where the opinion is well supported by acceptable clinical and diagnostic techniques *and* is not inconsistent with other substantial evidence. 532 F.3d at 608. Because the ALJ pointed to both Dr. Madala's opinion and other evidence, his decision to deny Dr. Aloman's Arthritic report was free of error, and his remaining task was to apply the factors of 20 C.F.R. § 404.1527 to the medical opinions weight them as they so merited.[9]

Yet in giving great weight to Dr. Madala's opinion, the ALJ erred for other reasons. Dr. Madala's opinion appears to contain a significant error as to Plaintiff's relevant diagnosis, which may well undermine the opinion's supportability, and the ALJ needed to discuss that issue in order to afford the opinion "great weight." As described, Dr. Madala reviewed the evidence on the premise that Plaintiff suffers from osteoarthritis, when the evidence overwhelmingly identifies her diagnosis as seronegative rheumatoid arthritis, an entirely separate ailment. As made clear below, the error was not one of semantics. The specificity of the diagnosis was an important

---

[9]     Because the flaws in Dr. Aloman's opinion to which the ALJ pointed when declining to apply the treating physician rule also support his decision to give her opinion little weight, the decision is free of error as to the weight her Arthritic Report received.

line of evidence that ran contrary to the ALJ's non-disability determination, and the regulations therefore required that he discuss it. *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999) ("an ALJ may not ignore an entire line of evidence that is contrary to [his] findings").

Osteoarthritis is distinct from rheumatoid arthritis. The former is a common type of arthritis that "occurs when the protective cartilage on the ends of [the] bones wears down over time." *Osteoarthritis*, The Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/osteoarthritis/basics/definition/con-20014749 (last visited Oct. 15, 2015). In contrast, rheumatoid arthritis is the immune system's attack upon the body's connective tissue. *Rheumatoid Arthritis*, The Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/rheumatoid-arthritis/basics/definition/con-20014868 (last visited Oct. 15, 2015). As the Court earlier noted, rheumatoid arthritis may be seronegative, and therefore, its diagnosis is not precluded by absence of serologic evidence.

Dr. Madala recognized that Plaintiff's treating physicians had diagnosed her with "seronegative inflammatory arthritis." Their treatment notes repeatedly mention "rheumatoid arthritis," "seronegative arthritis," and "inflammatory arthritis." Only Dr. Ajmani's treatment notes expressed doubt that Plaintiff's joint pain was an autoimmune condition, but they are the earliest notes of treatment and also equivocate on the topic. In contrast, Dr. Aloman's diagnosis and course of treatment confirmed that she determined that Plaintiff's impairment was seronegative inflammatory arthritis, and other providers who examined Plaintiff and her records—Dr. Qasim and Dr. Mihailescu—agreed with this diagnosis. Stated simply, as the course of the condition took hold, Plaintiff's doctors were consistent about the nature of her disease.

Despite this, Dr. Madala's opinion stated without explanation that Plaintiff suffers from osteoarthritis. She was the first physician of record to find that diagnosis. When evaluating the record as a whole, Dr. Madala's diagnosis of osteoarthritis—without an examination of Plaintiff—appears to rest heavily (if not entirely) on Dr. Shah's exam report, which she extensively quoted in her consulting opinion. (*See* R. 89, quoting R. 271.) Turning, then, to Dr. Shah's report, he reasoned that Plaintiff lacked rheumatoid arthritis on one fact alone: her negative lab tests.

Dr. Shah's analysis is problematic. The absence of serologic proof does not preclude an RA diagnosis. Indeed, Plaintiff's specific diagnosis of inflammatory arthritis was *seronegative*. Dr. Aloman's treatment notes establish that she, like Dr. Shah, recognized that Plaintiff's blood work was negative for serologic indicia of rheumatoid arthritis. (R. 319.) Yet as she continued to see Plaintiff, Dr. Aloman determined that Plaintiff's symptoms were consistent with seronegative rheumatoid arthritis, and she treated her for this.[10] Dr. Shah's report indicated that he reviewed at least some of Dr. Aloman's progress notes that plainly used the term "seronegative," and he also confirmed in his exam report that he read the Arthritic Report, in which Dr. Aloman described Plaintiff's diagnosis as "seronegative inflammatory arthritis." Notwithstanding his consideration of these records, Dr. Shah rested his conclusion that Plaintiff lacked rheumatoid arthritis on the absence of positive blood tests, without further discussion of her seronegative diagnosis.

---

[10] For example, Remicade is indicated for autoimmune conditions like rheumatoid arthritis; it is not FDA approved for treatment of osteoarthritis. *See Infliximab (Remicade)*, American College of Rheumatology, http://www.rheumatology.org/Learning-Center/Treatment-Guidelines/Medication-Guide-Infliximab-Remicade (last visited Oct. 15, 2015).

The ALJ should have considered, discussed, and resolved the issue that Dr. Madala inexplicably diagnosed osteoarthritis, rather than seronegative rheumatoid arthritis like Plaintiff's treating physicians, before concluding that her opinion was "well supported" and entitled to great weight. Standing in conflict with their analyses were not only Dr. Aloman's extensive treatment notes, but also findings by Dr. Mihailescu and Dr. Qasim that Plaintiff has seronegative rheumatoid arthritis. (R. 548, 564.) Additionally, although Dr. Fakhouri did not identify rheumatoid arthritis as a cause of Plaintiff's wrist nodule, his diagnosis of De Quervain's tendinitis may have provided additional support to Dr. Aloman's diagnosis, for the condition often occurs in RA patients. Moreover, the June 2013 RF test was positive, which also challenges Dr. Madala's (and Dr. Shah's) reasoning that Plaintiff did not have RA. Each of these facts (and others) contrasted sharply with Dr. Madala's osteoarthritis diagnosis. Since the ALJ did not address these issues, his determination that Plaintiff's condition was osteoarthritis is "so poorly articulated as to prevent meaningful review, . . . ." *Hopgood*, 578 F.3d at 698.

In a case involving similar factual circumstances, the Seventh Circuit found error. In *Arnett v. Astrue*, the ALJ failed to incorporate a plaintiff's diagnosed impairment into the RFC analysis. There, the plaintiff's doctor had diagnosed her with vascular dementia, but the ALJ's decision "never mentioned that [the plaintiff] had been diagnosed with vascular dementia." 676 F.3d 586, 592 (7th Cir. 2012). Notwithstanding the Commissioner's argument that the RFC finding was consistent with dementia, the court found error because, "[w]ithout any discussion of [the plaintiff's] dementia, this court has no idea what the ALJ thought about this evidence." *Id.*

Likewise, this Court has no idea whether and why the ALJ thought Plaintiff did not have seronegative rheumatoid arthritis and its possibly unique limitations, and how the evidence of her limitations or allegations should be evaluated in light of that condition. The Court does not know whether the ALJ's closer examination of this apparent error in Dr. Madala's opinion will result in an award of benefits. At the same time, it cannot confidently conclude that additional discussion of the issue and further development of the record as required thereby will not modify the ALJ's view; the diagnosis discrepancy may well have affected the ALJ's analysis not only at step four, but also at steps two and three.[11] Because the ALJ must discuss the issues identified in this Opinion in the first instance, his failure to logically bridge between evidence and conclusion was not harmless. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2012) (noting that the court should apply harmless error only when it is "convinced that the ALJ will reach the same result").

In sum, this Court has before it an ALJ's decision that provides his reasons for finding that Plaintiff is not disabled by a condition that she appears not to have. On remand, the ALJ should conduct further proceedings as is consistent with this opinion, which may well require development of the record. *See Wilcox v. Astrue*, 492 Fed. App'x 674, 678 (7th Cir. 2012) (acknowledging the ALJ's qualified duty to develop the record, which includes ordering such exams as are necessary to sufficiently evaluate a benefits claim).

_____

[11] For example, at step three, the ALJ stated that Plaintiff did not meet Listings 14.06 and 14.09 because her blood tests were negative for serologic proof of RA. His reasoning overlooks that RA can be seronegative, and also that Plaintiff later tested positive for rheumatoid factor.

**CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 13) is denied and Plaintiff's Motion for Summary Judgment (Doc. 12) is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings.

ENTER:

Dated: October 20, 2015

SHEILA FINNEGAN
United States Magistrate Judge